******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# SOLEDAD NUNEZ *v.* GWENDOLYN BROWN-WHITE ET AL.
## (AC 48330)

Seeley, Wilson and Flynn, Js.

*Syllabus*

The plaintiff appealed from the trial court's judgment granting the defendants' motion to enforce a settlement agreement. The plaintiff claimed, inter alia, that the court improperly granted the motion to enforce the agreement because her former counsel, A, did not have actual authority to bind her to the agreement. *Held*:

The trial court's factual finding that there was a meeting of the minds as to the essential elements of the settlement agreement was not clearly erroneous, as, during a hearing held pursuant to *Audubon Parking Associates Ltd. Partnership* v. *Barclay & Stubbs, Inc.* (225 Conn. 804) (*Audubon*), A testified that he had discussed the terms of the agreement with the plaintiff and sent an email containing the terms to the defendants' counsel, who prepared and sent a draft of the agreement to A, and A had never sent changes to the draft agreement or anything disputing its terms to the defendants' counsel and, thus, the fact that the plaintiff did not sign the settlement agreement was unavailing.

The plaintiff's claim that the trial court improperly relied on preliminary email exchanges and oral communications between counsel as evidence of a binding settlement was unavailing, as it was not improper for the court to rely on the email communications entered into evidence at the hearing as evidence of the parties' words and conduct in determining that a meeting of the minds had occurred, especially when the emails memorialized the terms that the attorneys had discussed at the pretrial conference and expressly indicated the plaintiff's acceptance of the settlement offer, and, in addition, A informed the court's caseflow coordinator that the case had been settled but not withdrawn.

The plaintiff's claim that A did not have actual authority to bind her to the settlement agreement was unavailing, as the trial court properly did not afford any evidentiary value to the plaintiff's unsworn declaration and the statements contained therein, and the plaintiff did not file a motion for articulation of the court's decision with respect to its failure to make explicit findings with respect to A's authority to settle the action.

The plaintiff's claim that the trial court misapplied *Audubon* by enforcing the settlement agreement despite the existence of disputed facts and ambiguity in certain terms of the agreement was unavailing, as the court's finding that the parties had entered into an enforceable settlement agreement was supported by evidence, including the parties' overt acts and words.

Argued January 15—officially released August 4, 2026

*Procedural History*

Action to recover damages for, inter alia, invasion of privacy by false light, and for other relief, brought to the Superior Court in the judicial district of Fairfield, where the court, *Gould, J.*, granted the defendants' motion to enforce a settlement agreement and rendered judgment thereon, from which the plaintiff appealed to this court. *Affirmed*.

*Darnell D. Crosland*, for the appellant (plaintiff).

*Michael Feldman*, for the appellees (defendants).

*Opinion*

SEELEY, J. The plaintiff, Soledad Nunez, appeals from the judgment of the trial court, rendered after a hearing pursuant to *Audubon Parking Associates Ltd. Partnership* v. *Barclay & Stubbs, Inc.*, 225 Conn. 804, 811–12, 626 A.2d 729 (1993) (*Audubon*),[1] granting a motion to enforce a settlement agreement filed by the defendants, Gwendolyn Brown-White and Seaview Village Condominium Association, Inc. (condominium association). On appeal, the plaintiff claims that the court improperly granted the defendants' motion to enforce the settlement agreement because (1) there was no meeting of the minds, (2) the court improperly relied on preliminary email exchanges and oral communications between counsel as evidence of a binding settlement, (3) the plaintiff's former counsel, Attorney Daniel Angelone, did not have actual authority to bind the plaintiff to the settlement agreement, and (4) the court failed to resolve material factual disputes concerning the plaintiff's consent, attorney authority and the finalization of essential terms before enforcing the settlement agreement and, thus, misapplied *Audubon* by enforcing the agreement

---

[1] "An *Audubon* hearing is conducted to decide whether the terms of a settlement agreement are sufficiently clear and unambiguous so as to be enforceable as a matter of law." (Internal quotation marks omitted.) *Karlen* v. *Saleeb*, 238 Conn. App. 224, 225 n.2, 356 A.3d 352 (2026); see also *Audubon Parking Associates Ltd. Partnership* v. *Barclay & Stubbs, Inc.*, supra, 225 Conn. 811–12.

despite the existence of those disputed facts and ambiguity in the terms of the agreement.[2] We disagree and affirm the judgment of the court.

The following procedural history and undisputed facts are relevant to this appeal. In October 2022, the plaintiff commenced the present action against the defendants. In a four count complaint dated October 21, 2022, the plaintiff, both in her individual capacity and in her capacity as secretary of the executive board of the condominium association, alleged claims against the defendants for invasion of privacy by false light, defamation per se, negligent infliction of emotional distress, and a violation of the Connecticut Unfair Trade Practices Act, General Statutes § 42-110a et seq. In her claims against the defendants, the plaintiff, a resident of a condominium and a member of a condominium association and former president of the executive board of the condominium association, alleged that Brown-White had engaged in a "campaign of intimidation, harassment, abuse, and blatantly false narratives against the plaintiff" for the purpose of supplanting the plaintiff as president of the executive board, which resulted in the plaintiff's reputation being severely tarnished.

On July 9, 2024, the court held a pretrial conference, at which the plaintiff's counsel at the time, Attorney Angelone, and the defendants' counsel, Attorney Kristen Greene, engaged in settlement discussions. Specifically, they discussed monetary and nonmonetary terms of a settlement. The next day, July 10, 2024, Attorney Angelone sent an email to Attorney Greene, stating: "As per my previous voicemail, [the plaintiff] accepts [the] [d]efendants' offer of settlement for $5000. Additionally, subject to review of the specific language, she agrees to the principles of confidentiality, [nondisparagement], being responsible for attorney's fees in future litigation raised by her against [the] [d]efendants in which [the]

---

[2] We note that the plaintiff's statement of the issues on appeal lists seven different issues, many of which overlap. As such, we have organized the claims in a different manner, so as to address similar claims together.

[d]efendants prevail, [and] not to run for [the] . . . board [of the condominium association]. Please forward for my review a draft of the [s]ettlement [a]greement at your convenience. I will alert caseflow that the matter has been settled." Attorney Greene responded that same day with an email stating: "Ok, thanks [Attorney Angelone]. To clarify, the essential terms of the settlement agreement include: **(1)** $5000 payment; **(2)** [g]eneral release; **(3)** [nondisparagement]; **(4)** [c]onfidentiality; **(5)** [i]f [the plaintiff] brings legal action against the [condominium] [a]ssociation [or] its [representatives] in the future and loses or withdraws, she pays [the] [a]ssociation/[representive's] attorney's fees; **(6)** [n]o admission of liability; [and] **(7)** [s]he won't run for the [b]oard in the future. I will prepare the agreement and send to you." Also that same day, Attorney Angelone informed a caseflow coordinator that the case may be marked as "settled but not withdrawn," after which a notice was issued indicating that "[t]his case has been marked settled but not withdrawn. A withdrawal is due by the date and time indicated above [September 9, 2024, at 5 p.m.]. Failure of counsel to file a withdrawal by the above date will result in the case being dismissed."

On July 11, 2024, Attorney Greene sent Attorney Angelone a draft of the release and settlement agreement, which contained the terms discussed at the pretrial conference on July 9, 2024, as memorialized in the July 10, 2024 emails between counsel. Attorney Angelone responded on July 11, 2024, stating: "Thanks. I'll review and get back to you." On July 19, 2024, Attorney Greene sent the first of a number of follow-up emails to inquire about the status of the plaintiff's execution of the release and settlement agreement, asking, "When can I expect the signed [r]elease and [s]ettlement [a]greement?" That was followed by another email on July 23, 2024, asking, "Can you please let me know about this?" Attorney Greene sent two more emails on July 25 and 26, 2024, asking for a response and indicating that she had not heard anything and intended to file a caseflow request for a conference with the trial judge. On July 26, 2024,

Attorney Angelone responded by apologizing for the delay, explaining that he had had some personal medical issues, and stating that his "client [was] coming to [his] office next week" and that he "hope[d] to have this wrapped up very soon." Later that day, Attorney Greene responded by stating that she "look[ed] forward to getting the signed agreement next week." Attorney Greene followed up with an email on July 29 asking Attorney Angelone to let her know when the plaintiff was coming in that week and when she could expect a signed agreement, to which Attorney Angelone responded with an email on July 31, 2024, stating that the plaintiff would be in his office on Friday, August 2, 2024, to execute the release and settlement agreement.

On August 2, 2024, Attorney Greene emailed Attorney Angelone asking: "Has the agreement been signed? Please advise me asap." On August 5, 2024, Attorney Angelone reported by email to Attorney Greene that "[t]he progress with [his] client [was] going slower than expected," but that he would consent to a caseflow request for a status conference. Thereafter, Attorney Greene submitted a caseflow request for a status conference.

On August 9, 2024, Attorney Darnell Crosland filed an appearance on behalf of the plaintiff in lieu of Attorney Angelone.[3] After entering his appearance on behalf of the plaintiff, Attorney Crosland challenged whether Attorney Angelone had the plaintiff's authority to enter into a settlement agreement. The defendants filed a motion to enforce the settlement agreement on August 15, 2024. In their motion, the defendants claimed that the parties had reached a settlement agreement, as the terms were discussed at the pretrial conference, Attorney Angelone agreed to discuss those terms with the plaintiff and to respond, which he did do, indicating that the plaintiff had agreed to accept the settlement offer and terms, and the case was reported as settled with the court. The

---

[3]At the *Audubon* hearing, Attorney Angelone testified that, after Attorney Crosland filed his appearance, Attorney Angelone had no further involvement with the present case with the exception of the *Audubon* hearing.

defendants contended further that "there was a meeting of the minds on all essential terms on July 10, 2024," and that the plaintiff's failure ultimately to sign the written agreement did not invalidate the settlement.

The plaintiff filed an objection to the defendants' motion to enforce the settlement agreement on September 30, 2024, in which the plaintiff asserted that she never signed a settlement agreement, that Attorney Angelone did not have authority to enter into a settlement agreement on her behalf, that no meeting of the minds was ever reached in light of the "subject to review" language in Attorney Angelone's July 10, 2024 email, and that the terms of the purported settlement agreement were not clear. In her objection, the plaintiff referred to a purported "sworn declaration" (declaration) she had filed with the court on September 4, 2024, in which she asserted that she never agreed to the terms of the settlement offer presented to her by Attorney Angelone, who allegedly had attempted to accept the settlement offer on her behalf, against her instructions and understanding.[4] The declaration includes a statement indicating that it was being made under penalty of perjury and it was signed and dated by the plaintiff.

[4] Specifically, the declaration provides: "I, Soledad Nunez, being over eighteen (18) years of age and competent to testify, hereby make the following statements under oath and from personal knowledge: (1) I am a party to the above captioned matter. (2) I understand that this sworn declaration is being submitted in opposition to a [m]otion to [e]nforce [s]ettlement. (3) On July 10, 2024, my previous counsel, [A]ttorney . . . Angelone, informed me of a settlement offer. However, I did not agree to the terms. My understanding was that the offer and its terms were negotiable, and it was my intention to negotiate and discuss the terms before providing my authorization. (4) On August 9, 2024, I retained a new counsel, [A]ttorney . . . Crosland, primarily because I discovered that [A]ttorney . . . Angelone was attempting to accept a settlement on my behalf, against my instructions and understanding. In this vein, I hired [A]ttorney Crosland, whose office communicated on my behalf that I had never agreed to the settlement or its terms. (5) The key point I wish to emphasize is that I, Soledad Nunez, have never consented to or agreed to any settlement agreement, either with my previous attorney or with my current attorneys." The declaration also provides: "I declare under penalty of perjury under the laws of the [s]tate of Connecticut that the foregoing is true and correct."

The court, *Gould, J.*, held an *Audubon* hearing on the defendants' motion to enforce the settlement agreement on December 12, 2024. At the *Audubon* hearing, Attorney Angelone was the only witness who testified. Specifically, he testified about the pretrial conference and having discussed with Attorney Greene monetary and nonmonetary terms of the settlement. With respect to his July 10, 2024 email, indicating that the plaintiff had accepted the defendants' settlement offer, Attorney Angelone responded, "Yes" when asked whether he had authority from the plaintiff to make that communication. Although, due to attorney-client privilege reasons, he would not disclose the content of his discussions with the plaintiff, Attorney Angelone testified that "[the plaintiff] authorized [him] to . . . [accept the settlement]," and that he "would never send any communication to opposing counsel saying [that his] client has agreed to settle, when they haven't." In his testimony, however, Attorney Angelone indicated that he did not believe the agreement was final because, even though the amount of the settlement was a definite and final term, the plaintiff had agreed only to "principles" of the nonmonetary terms, and that the plaintiff needed to see the language of the nonmonetary terms "before [they] could come to a final agreement on them."[5] Attorney Angelone also

---

[5]In particular, the following colloquy transpired on direct examination of Attorney Angelone by Attorney Greene:

"Q. So, just to be clear, [the plaintiff] agreed to the principle of being responsible for attorney's fees in future litigation raised by her against [the] defendants in which [the] defendants prevail, correct?

"A. Those principles, yes.

"Q. She agreed to the principle that she would not run for the condo board, correct?

"A. Again, in principle; yes.

"Q. She agreed to the principle that—of confidentiality, correct?

"A. Again, in principle, yes.

"Q. And she agreed to the principle of nondisparagement, correct?

"A. Once again, in principle, yes. . . .

"Q. Okay. You discussed them with your client before you sent this email?

"A. I—

"Q. I'm not asking about what the discussions were, but did you discuss them with your client before you sent this email?

acknowledged that he had conveyed to the plaintiff the principles of those terms, as they had been discussed at the pretrial conference.

During direct examination, Attorney Angelone was asked about his communications with the plaintiff regarding the settlement.[6] The following colloquy took place:

"Q. So, this is your email to [the plaintiff] on July 9, 2024, correct?

"A. Yes.

"Q. And that's when we had the pretrial, right?

"A. Yes.

"Q. Same day?

"A. Yes.

"Q. And you told her the offer indicating the $5000 as well as these terms that, one, she agrees not to run for

"A. Well, you got to remember, I did not have the language of the specific terms at the time, so I could not tell her what would be inside the terms. Nevertheless, the principles, as were outlined in our very brief conversation with [the court at the pretrial conference], I was able to convey to her.

* * *

"Q. You understood when you sent this email that the agreement was not just to settle for money, correct?

"A. I understood that part of the agreement to settle was for money. The other part were these principles, which needed to be flushed out in language that I had never seen before."

[6]Those communications were documented in emails that were included in the defendants' proffered exhibit L. With respect to the email communications in exhibit L, Attorney Angelone expressed concern about violating the attorney-client privilege by disclosing some of the communications, and Attorney Crosland objected to their admission. The court stated that it would mark the exhibit for identification, conduct an in-camera review of the emails and determine whether any were covered by the attorney-client privilege. Thereafter, the court reviewed the emails and stated: "I'm going to . . . allow all of this in, with the exception . . . of the second and third paragraphs of the July 9, 12:17 p.m. email from [Attorney]. . . Angelone to [the plaintiff]." The court stated that it would "simply ignore them" or that they could be "whited out," and informed Attorney Crosland that "this is in evidence at this

the board at [the condominium association] again. You agree not to disparage [Brown-White] or [the condominium association]. The parties agree to keep the terms of settlement confidential. If you sue [the condominium association] in the future and lose, you would be responsible for their attorney's fees, right?

"A. Yes.

"Q. And those are the terms we discussed with [the court] in the pretrial, correct?

"A. The principles, yes.

"Q. And those are the things that you communicated to [the plaintiff], correct?

"A. Yes.

"Q. And she agreed to those principles, correct?

"A. She agreed to the principles, yes."

Attorney Angelone further testified that he had informed the caseflow coordinator on July 10, 2024, that "we could report [the present case] as settled but not withdrawn," and that he specifically had requested a forty-five[7] day time frame in which to withdraw, because, at that time, he had not yet received the draft settlement agreement to review, and he thought that there might be some issues with the language. Finally, Attorney Angelone testified that, at some point after he had reported the case settled to the caseflow coordinator, he had received a text message from the plaintiff, which contained a request by her regarding additional terms such as reimbursement for certain fines paid, removal

---

time." The list of exhibits and the exhibit sticker for exhibit L, however, incorrectly indicate that exhibit L is an identification exhibit only. See Docket Entry No. 150.00; see also exhibit L. Attorney Angelone was questioned and testified about the contents of those email communications in detail during his testimony at the *Audubon* hearing.

[7]Attorney Angelone testified that he had requested a forty-five day time frame in which to withdraw the plaintiff's claims against the defendant but that the caseflow coordinator granted a sixty day time frame in which to withdraw the plaintiff's claims.

of a "no parking" sign, and a reciprocal bar on the ability of Brown-White to run for a position on the board of the condominium association. Attorney Angelone testified that he never communicated to Attorney Greene any proposed changes or new terms or that anything in the draft agreement was inconsistent with prior settlement discussions. Thereafter, the parties rested and the court orally rendered its decision on the defendants' motion to enforce the settlement agreement.[8]

In its decision, the court first stated that it had "listened carefully to the evidence in this case . . . [and] reviewed both the motion to enforce the settlement and the response thereto, and [that it would] make the following findings of fact and . . . ultimate decision on the motion." Those findings included: "[A]t a pretrial [conference] on or about July 9, 2024, both [Attorney Angelone] and [Attorney Greene] reached an agreement in settlement purposes in the amount of $5000, an agreement on the principles of confidentiality, nondisparagement, being responsible for attorney's fees and future litigation raised by the plaintiff against the defendants in which the defendants prevail, and that [the plaintiff] would not run for the . . . board [of the condominium association]. This . . . agreement was memorialized by . . . Attorney Angelone to [Attorney Greene] on or about July 10, 2024.

"Within that time frame, [Attorney Angelone] indicated to our caseflow office . . . that the case was settled and [that] it was placed on the settled but not withdrawn list, which is . . . generally the [step] that [is] taken in . . . a number of cases.

"Once the case was marked settled, wording for potential agreement on specific language for those principles contained in the July 10 email and the July 9 agreement was sent from [Attorney Greene] to . . . Attorney Angelone. . . . Attorney Angelone never indicated or communicated any issue with the provisions of the written

---

[8] The record contains a signed transcript of the court's oral decision in compliance with Practice Book § 64-1.

agreement [that] have been memorialized by [Attorney Greene]. What . . .Attorney Angelone did at some point was obtain some information from . . . [the plaintiff] after the case was marked as settled, and there was some discussion of language which was not contained in the agreement, as I've recited it previously.

"Based on these findings of fact, my review of the documentation and the careful review both of the case law as indicated in the . . . defendants' brief, I will find that the parties did reach a meeting of the minds to settle the case on July 9, 2024. Therefore, the motion to enforce the settlement is granted." This appeal followed.

Before we address the merits of the claims raised on appeal, we first set forth our standard of review and general principles of law governing motions to enforce a settlement agreement. "A trial court has the inherent power to enforce summarily a settlement agreement as a matter of law when the terms of the agreement are clear and unambiguous. . . . Agreements that end lawsuits are contracts, sometimes enforceable in a subsequent suit, but in many situations enforceable by entry of a judgment in the original suit. . . . Summary enforcement is not only essential to the efficient use of judicial resources, but also preserves the integrity of settlement as a meaningful way to resolve legal disputes. When parties agree to settle a case, they are effectively contracting for the right to avoid a trial. . . . Nevertheless, the right to enforce summarily a settlement agreement is not unbounded. The key element with regard to the settlement agreement in [*Audubon Parking Associates Ltd. Partnership* v. *Barclay & Stubbs, Inc.*, supra, 225 Conn. 812] . . . [was] that there [was] no factual dispute as to the terms of the accord. Generally, [a] trial court has the inherent power to enforce summarily a settlement agreement as a matter of law [only] when the terms of the agreement are clear and unambiguous . . . and when the parties do not dispute the terms of the agreement. . . . The rule of *Audubon* effects a delicate balance between concerns of judicial economy on the one hand and a party's constitutional

rights to a jury and to a trial on the other hand. . . . To use the *Audubon* power outside of its proper context is to deny a party these fundamental rights and would work a manifest injustice. . . .

"A settlement agreement is a contract among the parties. . . . In order to form a binding and enforceable contract, there must exist an offer and an acceptance based on a mutual understanding by the parties . . . . The mutual understanding must manifest itself by a mutual assent between the parties. . . . In other words, [i]n order for an enforceable contract to exist, the court must find that the parties' minds had truly met. . . . If there has been a misunderstanding between the parties, or a misapprehension by one or both so that their minds have never met, no contract has been entered into by them and the court will not make for them a contract which they themselves did not make. . . . Meeting of the minds is defined as mutual agreement and assent of two parties to contract to substance and terms. It is an agreement reached by the parties to a contract and expressed therein, or as the equivalent of mutual assent or mutual obligation. . . . This definition refers to fundamental misunderstandings between the parties as to what are the essential elements or subjects of the contract. It refers to the terms of the contract, not to the power of one party to execute a contract as the agent of another. . . .

"A contract is not made so long as, in the contemplation of the parties, something remains to be done to establish the contractual relation. The law does not . . . regard an arrangement as completed which the parties regard as incomplete. . . . In construing the agreement . . . the decisive question is the intent of the parties as expressed. . . . The intention is to be determined from the language used, the circumstances, the motives of the parties and the purposes which they sought to accomplish. . . . Furthermore, [p]arties are bound to the terms of a contract even though it is not signed if their assent is otherwise indicated. . . .

"[When] the general terms on which the parties indisputably had agreed . . . included all the terms that were essential to an enforceable agreement . . . [u]nder the modern law of contract . . . the parties . . . may reach a binding agreement even if some of the terms of that agreement are still indefinite. . . . The test of disputation . . . must be applied to the parties at the time they entered into the alleged settlement. To hold otherwise would prevent any motion to enforce a settlement from ever being granted. . . .

"When a party challenges the trial court's legal conclusion that the agreement was summarily enforceable, we must determine whether that conclusion is legally and logically correct and whether [it finds] support in the facts set out in the memorandum of decision . . . . In addition, to the extent that the [party's] claim implicates the court's factual findings, our review is limited to deciding whether such findings were clearly erroneous. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . In making this determination, every reasonable presumption must be given in favor of the trial court's ruling. . . . *Worth* v. *Picard*, 233 Conn. App. 38, 47–50, 338 A.3d 1195 (2025)." (Internal quotation marks omitted.) *Bay Advance, LLC* v. *Halajian*, 236 Conn. App. 228, 234–36, 347 A.3d 1207 (2025).

I

The plaintiff first claims that the court improperly granted the defendants' motion to enforce the settlement agreement because there was no meeting of the minds. Specifically, she claims that the court erred in finding a meeting of the minds "when no signed agreement existed and critical terms remained open." According to the plaintiff, her "conditional acceptance," as indicated by Attorney Angelone's statement in the July 10, 2024 email that the settlement offer was "subject to review of

the specific language" regarding the nonmonetary terms, defeated any contract formation. She also acknowledges that the absence of a signed writing is not dispositive by itself, but contends that it is "highly probative when combined with [her] conditional acceptance and [the] ongoing negotiations." Finally she argues that her "sworn declaration rebutted any finding of mutual assent." We disagree with these contentions.

The following legal principles guide our analysis. As we have indicated, "[m]eeting of the minds is defined as mutual agreement and assent of two parties to contract to substance and terms. It is an agreement reached by the parties to a contract and expressed therein, or as the equivalent of mutual assent or mutual obligation. . . . This definition refers to fundamental misunderstandings between the parties as to what are the *essential elements or subjects* of the contract. It refers to the terms of the contract . . . ." (Emphasis added; internal quotation marks omitted.) *Bay Advance, LLC* v. *Halajian*, supra, 236 Conn. App. 235. "Although '[t]he phrase "meeting of the minds" is . . . commonly used by the courts to determine whether there has been mutual assent,' it has been described as a 'misnomer because the minds of the parties to a contract need not, in fact, subjectively meet; rather . . . objective assent is all that is required.' 1 R. Lord, [Williston on Contracts (4th Ed. 2007)] § 3:2, p. 259 n.1; see also *Address* v. *Millstone*, 208 Md. App. 62, 82, 56 A.3d 323 (2012), cert. denied, 430 Md. 646, 62 A.3d 731 (2013)." *Connecticut Light & Power Co.* v. *Proctor*, 324 Conn. 245, 268, 152 A.3d 470 (2016). Indeed, "[t]he law of contract has come to recognize that a true 'meeting of the minds' is no longer essential to the formation of a contract and that rights and obligations may arise from acts of the parties, usually their words, upon which a reasonable person would rely. E. Farnsworth, Contracts [(1982)] § 3.6 [p. 113]." *State* v. *Smith*, 210 Conn. 132, 140, 554 A.2d 713 (1989).

As this court has explained with respect to the mutual assent needed to form a binding and enforceable contract:

"It is axiomatic that . . . there must exist an offer and an acceptance based on a mutual understanding by the parties. . . . The mutual understanding must manifest itself by a mutual assent between the parties. . . . The parties' intentions manifested by their acts and words are essential to the court's determination of whether a contract was entered into and what its terms were. . . . Whether the parties intended to be bound without signing a formal written document is an inference of fact [to be made by] the trial court . . . . [M]utual assent is to be judged only by overt acts and words rather than by hidden, subjective or secret intention of the parties. . . . Indeed, [a] manifestation of mutual assent may be made even though neither offer nor acceptance can be identified and even though the moment of formation cannot be determined. . . . Parties are bound to the terms of a contract even though it is not signed if their assent is otherwise indicated." (Citation omitted; internal quotation marks omitted.) *Downing* v. *Dragone*, 216 Conn. App. 306, 317, 285 A.3d 59 (2022), cert. denied, 346 Conn. 903, 287 A.3d 601 (2023). "Whether a meeting of the minds has occurred is a factual determination." *M.J. Daly & Sons, Inc.* v. *West Haven*, 66 Conn. App. 41, 48, 783 A.2d 1138, cert. denied, 258 Conn. 944, 786 A.2d 430 (2001).

At the outset, we find the plaintiff's reliance on the fact that she did not sign the settlement agreement to be unavailing. See *Downing* v. *Dragone*, supra, 216 Conn. App. 318–21 (court found, on basis of parties' conduct and numerous emails exchanged, that defendant assented to be bound by unsigned written agreement); see also *Karlen* v. *Saleeb*, 238 Conn. App. 224, 239–40 n.13, 356 A.3d 352 (2026) ("Although the plaintiff did not sign the settlement agreement, it is well settled in Connecticut that [p]arties are bound to the terms of a contract even though it is not signed if their assent is otherwise indicated. . . . [T]here is evidence to support the court's finding that there had been a meeting of the minds . . . and the court's conclusion that the written agreement need not be signed [by the plaintiff] to be enforceable

against him is therefore legally and logically correct." (Citations omitted; internal quotation marks omitted.)).

We also disagree with the plaintiff's assertion that "critical terms remained open." The plaintiff's contention is largely premised on the "subject to review" language in Attorney Angelone's July 10, 2024 email, although she has not cited any case law supporting her claim that the email constituted a "conditional acceptance" that defeated any finding of mutual assent needed to form a binding contract. The July 10 emails exchanged demonstrate that Attorney Angelone informed Attorney Greene that the plaintiff "accept[ed] [the] [d]efendants' offer of settlement for $5000. Additionally, subject to review of the specific language, she agree[d] to the principles of confidentiality, [nondisparagement], being responsible for attorney's fees in future litigation raised by her against [the] [d]efendants in which [the] [d]efendants prevail, [and] not to run for [the] . . . board [of the condominium association]." Attorney Greene responded that same day with an email stating: "To clarify, the essential terms of the settlement agreement include: (1) $5000 payment; (2) [g]eneral release; (3) [nondisparagement]; (4) [c]onfidentiality; (5) If [the plaintiff] brings legal action against the [condominium] [a]ssociation [or] its [representatives] in the future and loses or withdraws, she pays [the association's]/[representive's] attorney's fees; (6) [n]o admission of liability; [and] (7) [s]he won't run for the [b]oard in the future. I will prepare the agreement and send to you." Attorney Greene submitted a draft of an agreement embodying the terms to which the parties had agreed to Attorney Angelone for the plaintiff's review, and a series of emails followed, all of which supported an inference that the parties had reached an agreement that was awaiting the plaintiff's signature. At no point during those email exchanges did Attorney Angelone convey to Attorney Greene that the plaintiff wanted to include new or different terms, or that the agreement as drafted was not satisfactory. The emails also must be considered in connection with Attorney Angelone's testimony about what he had communicated

to the plaintiff about the terms of the agreement. In particular, Attorney Angelone responded, "Yes" when asked whether he told the plaintiff "the offer indicating the $5000 as well as [the] terms that . . . she agrees not to run for the board at [the condominium association] again . . . not to disparage [Brown-White] or [the condominium association] . . . to keep the terms of settlement confidential . . . [and to] be responsible for . . . attorney's fees" if she brings an action against the condominium association in the future and loses.

Notwithstanding Attorney Angelone's testimony to the effect that the plaintiff had agreed only to the "principles" of the nonmonetary terms, we conclude that the court reasonably could have found on the basis of the evidence before it that the parties had a meeting of the minds as to the essential terms of the settlement agreement, although the specific language of the nonmonetary terms to which they had agreed had not yet been drafted and was subject to review. As we have indicated, to defeat the mutual assent necessary to find a meeting of the minds, there must be a "fundamental [misunderstanding] between the parties as to what are the *essential elements or subjects* of the contract." (Emphasis added; internal quotation marks omitted.) *Bay Advance, LLC* v. *Halajian*, supra, 236 Conn. App. 235. In the present case, the record does not show the existence of any such fundamental misunderstanding as to the essential elements or the subject matter of the settlement agreement. Rather, the record demonstrates the existence of an offer and an acceptance, namely, that the plaintiff had agreed to a monetary payment of $5000 and to various nonmonetary terms, although the specific language of those nonmonetary terms was subject to review. See *Wittman* v. *Intense Movers, Inc.*, 202 Conn. App. 87, 99, 245 A.3d 479 ("[when] the general terms on which the parties indisputably had agreed . . . included all the terms that were essential to an enforceable agreement . . . [u]nder the modern law of contract . . . the parties . . . may reach a binding agreement even if some of the terms of that agreement are still indefinite" (internal quotation

marks omitted)), cert. denied, 336 Conn. 918, 245 A.3d 803 (2021). There is nothing in the email exchanges between counsel indicating that they were still in the process of discussing or negotiating additional terms of the settlement, the "subject to review" language pertained to terms to which the parties already had agreed and did not indicate that the agreement was subject to the inclusion of new terms or further negotiations, and there was no evidence presented demonstrating that the terms of the draft agreement submitted by Attorney Greene were disputed. In fact, Attorney Angelone acknowledged in his testimony that he never sent to Attorney Greene changes to the draft agreement or anything disputing its contents or indicating that changes needed to be made.[9] Also, the court specifically found that Attorney Angelone "never indicated or communicated any issue with the provisions of the written agreement [that was] memorialized by [Attorney Greene]."

Moreover, Attorney Angelone testified that he had informed a caseflow coordinator that the matter may be marked as "settled but not withdrawn." See *Krasko* v. *Konkos*, 224 Conn. App. 589, 610, 314 A.3d 34 (2024) ("[a] court's authority to enforce a settlement agreement by entry of judgment in the underlying action is especially clear where the settlement agreement is reported to the court during the course of a trial or other significant courtroom proceedings" (internal quotation marks omitted)). This occurred *before* Attorney Angelone received the draft agreement from Attorney Greene, which supports an inference that Attorney Angelone believed that the parties had reached a settlement on

---

[9]During cross-examination, Attorney Angelone testified that he had had a telephone conversation with the plaintiff on July 10 regarding the terms of the settlement and that, afterward, he sent her an email to confirm the conversation. He testified further that, in a response to his email, the plaintiff agreed to review the language and informed him that she wanted terms added to the agreement. Attorney Angelone also testified that this purported counteroffer from the plaintiff was never put in a final agreement. On redirect, Attorney Angelone testified that he never made any counteroffer or communicated the plaintiff's additional terms to Attorney Greene.

July 10, even though the particular language of the agreement needed to be reviewed.

This court previously has affirmed the granting of a motion to enforce a settlement agreement when the agreement was drafted *after* the parties reached their agreement to settle; in other words, a binding settlement agreement was found to exist even though the agreement had not yet been reduced to writing. For example, in *Worth* v. *Picard*, supra, 233 Conn. App. 42–44, in connection with an appeal to this court, the parties had engaged in an appellate preargument conference (PAC) on June 14, 2023, at which they agreed to the terms of a full and final settlement agreement, which subsequently was memorialized in writing. Thereafter, however, the plaintiff refused to proceed with the settlement, and an *Audubon* hearing followed, after which the court determined that the settlement agreement was enforceable. Id., 45–46. On appeal, the plaintiffs claimed that the draft settlement agreement submitted by the defendants did not reflect material aspects of the agreement. Id., 50–51. This court rejected that claim and concluded: "The plaintiff's contention that there was no meeting of the minds *after* the parties entered into the settlement at the June 14, 2023 PAC ignores the principle . . . that [t]he test of disputation . . . must be applied to the parties at the time they entered into the alleged settlement. . . . Therefore, any dispute as to purported deficiencies in the draft settlement documents is immaterial to the formation of the settlement agreement at the June 14, 2023 PAC . . . ." (Citation omitted; emphasis in original; internal quotation marks omitted.) Id., 51.

In *Worth*, this court also addressed the plaintiff's contention "that, following the June 14, 2023 PAC, 'there was a proposed resolution, some of which the parties tentatively agreed upon, subject to opposing attorneys' further submission of proposed settlement agreements for [her] review,' but that '[n]o specific terms and conditions were agreed [to], nothing was in writing for confirmation, nothing was signed, no written term

sheet or other written agreement was created at the end of the [June 14, 2023] PAC . . . and nothing was reported to any court to be placed on the record.'" Id., 52. This court held: "To the extent that the plaintiff attempts to challenge the court's factual findings regarding the formation of the agreement, the evidence admitted into the record during the *Audubon* hearing supports the court's determination that the parties entered into a settlement agreement with specific terms. Moreover, 'the fact that the settlement agreement was not reduced to writing or signed by the parties does not preclude it from binding the parties.'" Id., 52–53.

Similarly, in *Kinity* v. *US Bancorp*, 212 Conn. App. 791, 828, 277 A.3d 200 (2022), this court affirmed the trial court's granting of a motion to enforce a settlement agreement. In *Kinity*, as in the present case, the parties' attorneys had been exchanging emails discussing a potential settlement of the case, in which the insurance company defendants had offered to settle the plaintiff's claims against them for $10,000. Id., 804–805. The plaintiff's attorney subsequently emailed the attorney for the insurance company defendants on June 29, 2020, stating: "'I received the go-ahead from my client. He understands that it will be [$10,000] with no admission and release of all claims. You may send me a release. Thank you.' In response, [the attorney for the insurance company defendants] thanked [the plaintiff's counsel] . . . and stated that a release would be prepared for [the plaintiff's] review." Id., 805–806. On appeal, this court held that "the [trial] court did not err in concluding that the parties had a meeting of the minds and a settlement agreement when [the plaintiff's attorney] emailed [the insurance defendants' attorney] on June 29, 2020 . . . . [The] overt acts and words establish objective assent to a settlement agreement for $10,000 that was not contingent upon an agreement with [a different defendant]." Id., 828.

Likewise, in the present case, affording every reasonable presumption in favor of the trial court's ruling,

we cannot conclude that the court's factual finding of a meeting of the minds is clearly erroneous.[10] In light of the evidence before the court at the *Audubon* hearing concerning the parties' overt acts and words, including the emails exchanged between counsel setting forth the specific terms to which they had agreed and expressly conveying that the plaintiff had accepted the settlement offer, in conjunction with Attorney Angelone's conduct, in turn, in informing the caseflow coordinator that the matter could be marked settled but not withdrawn, the court reasonably determined that the parties had reached a settlement pursuant to the terms outlined in the July 10, 2024 emails. We do not believe that Attorney Angelone's email indicating that the agreement remained subject to review of the language pertaining to the nonmonetary terms to which the parties had agreed undermines a finding of mutual assent to the material terms, and we conclude that the trial court, in light of the evidence before it, properly rejected the plaintiff's attempt to qualify her clear acceptance of the settlement offer by differentiating between "principles" of the nonmonetary terms versus the terms themselves.[11]

[10]We reach this conclusion mindful that, under the "highly deferential" clearly erroneous standard of review; (internal quotation marks omitted) *Office of Chief Disciplinary Counsel* v. *Vena*, 236 Conn. App. 39, 59, 347 A.3d 945 (2025); "[w]e do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached. Rather, we focus on the conclusion of the trial court, as well as the method by which it arrived at that conclusion, to determine whether it is legally correct and factually supported. . . . The [fact-finding] function is vested in the trial court with its unique opportunity to view the evidence presented in a totality of circumstances, i.e., including its observations of the demeanor and conduct of the witnesses and parties, which is not fully reflected in the cold, printed record which is available to us." (Citation omitted; internal quotation marks omitted.) *O & G Industries, Inc.* v. *American Home Assurance Co.*, 204 Conn. App. 614, 624–25, 254 A.3d 955 (2021).

[11]We also disagree with the plaintiff's assertion that she could not be bound by the agreement because it was never finalized. See *Worth* v. *Picard*, supra, 233 Conn. App. 50 ("parties . . . may reach a binding agreement even if some of the terms of that agreement are still indefinite" (internal quotation marks omitted)); see also id., 50–51 (binding settlement agreement found to exist even though agreement had not yet

Accordingly, the court's conclusion that the agreement was summarily enforceable is legally and logically correct. See *Bay Advance, LLC* v. *Halajian*, supra, 236 Conn. App. 236.

Finally, we reject the plaintiff's assertion that her "sworn declaration rebutted any finding of mutual assent."[12] See footnote 4 of this opinion. As we previously stated in this opinion, the plaintiff filed the declaration with the court on September 4, 2024, and it appears in the court file as docket entry number 137.[13] Although the declaration was signed by the plaintiff and contains a statement that it was made under penalty of perjury, the plaintiff's statements in the declaration were not sworn to before an officer authorized to administer oaths. Thus, the declaration is not a "sworn" document as alleged by the plaintiff. See *McCullough* v. *Rocky Hill*, 198 Conn. App. 703, 710 n.11, 234 A.3d 1049 (document titled "'Affidavit of Plaintiff,'" which did not contain any indication that its contents were sworn to by plaintiff before clerk, notary public, or commissioner of Superior Court, did not satisfy requirements for proper affidavit), cert. denied, 335 Conn. 985, 242 A.3d 480 (2020);

been reduced to writing and finalized); *Kinity* v. *US Bancorp*, supra, 212 Conn. App. 823 (same).

[12] In her appellate brief, the plaintiff maintains that the declaration "was the only sworn evidence from a party with personal knowledge of her own intent. The court did not find the plaintiff not credible, nor did it make any finding that her declaration was rebutted by other evidence." These contentions are not accurate. As we explain in this opinion, the declaration was not sworn to and thus cannot be construed as "sworn evidence." The court made no express credibility findings as to the plaintiff because she never testified, and it can be inferred from its failure to reference the declaration specifically in its oral decision that it implicitly did not afford any evidentiary value to the plaintiff's unsworn hearsay statements therein, which she sought to have the court consider in lieu of providing testimony, under oath, that would have been subjected to cross-examination. We also note that at no point during the *Audubon* hearing did the plaintiff's counsel refer to or rely on the declaration or bring it to the attention of the court, which likely would have been objected to by the defendants and excluded on hearsay grounds given the plaintiff's failure to testify.

[13] In light of this, we disagree with the defendants that the declaration is not part of the record.

*Deutsch Bank National Trust Co.* v. *McKeith*, 156 Conn. App. 36, 43, 111 A.3d 545 (2015) (affidavit appended to motion to open, which was neither signed nor sworn to, was of "no evidentiary value" (internal quotation marks omitted)); *Viola* v. *O'Dell*, 108 Conn. App. 760, 768, 950 A.2d 539 (2008) (unsigned and unsworn affidavit, which was only confirmation of settlement presented to court, was "of no evidentiary value"); *Aley* v. *Aley*, 101 Conn. App. 220, 229, 922 A.2d 184 (2007) (court's child support determination and related orders had to be based on evidence, and contrary finding could not be based on representation made in unsworn document); see also *Fogarty* v. *Rashaw*, 193 Conn. 442, 444, 476 A.2d 582 (1984) (unsworn statements in documents that did not qualify as affidavits due to absence of oath would not have been admissible against plaintiff because of hearsay rule and, thus, could not be relied on in support of motion for summary judgment).

In *Wittman* v. *Intense Movers, Inc.*, supra, 202 Conn. App. 92 n.2, this court observed that "[t]he parties, without objection . . . [had] made many unsworn representations of fact during the [*Audubon*] hearing." After noting that "[t]he [trial] court's memorandum of decision [made] no reference to the unsworn oral representations of [the plaintiff's attorney] and the defendants as to what occurred during their settlement discussions," we concluded "that the court properly did not give any evidentiary weight to [those] representations"; id., 100 n.9; and we declined to consider them on appeal. Id., 92 n.2.

In the present case, the court's oral decision does not reference the plaintiff's declaration, although the court did state that, in reaching its decision, it had reviewed the plaintiff's objection to the motion to enforce the settlement agreement, in which the plaintiff relied on and referred multiples times to the declaration. We presume, therefore, that the court considered but rejected the unsworn, hearsay statements of the plaintiff, who did not testify, set forth in the declaration and conclude that the court properly did not afford them any evidentiary

value. See *Bay Advance, LLC* v. *Halajian*, supra, 236 Conn. App. 243 n.8; see also *Wittman* v. *Intense Movers, Inc.*, supra, 202 Conn. App. 92 n.2; *Deutsch Bank National Trust Co.* v. *McKeith*, supra, 156 Conn. App. 43. Furthermore, it was within the court's exclusive province, as the trier of fact, not to afford any weight to the declaration; see *Huang* v. *Murray*, 237 Conn. App. 753, 757, 353 A.3d 312 (2026); and we will not second-guess that determination. See *Zheng* v. *Xia*, 237 Conn. App. 242, 259, 351 A.3d 858 (2026). Accordingly, the plaintiff's reliance on the declaration to support her claims on appeal, namely, to establish the existence of a dispute as to the terms of the settlement or the lack of authority of Attorney Angelone, is of no avail.

II

The plaintiff's next claim is that the court improperly relied on preliminary email exchanges and oral communications between counsel as evidence of a binding settlement. We conclude that this claim lacks merit, and our resolution of it requires little discussion. It is well settled that "[t]he parties' intentions manifested by their acts and words are essential to the court's determination of whether a contract was entered into and what its terms were." (Internal quotation marks omitted.) *Downing* v. *Dragone*, supra, 216 Conn. App. 317. Enforceable settlement agreements have been found on the basis of email communications between counsel. See *Worth* v. *Picard*, supra, 233 Conn. App. 52–53 (evidence admitted into record at *Audubon* hearing, which included email correspondence, supported court's determination that parties entered into enforceable settlement agreement); *Kinity* v. *US Bancorp*, supra, 212 Conn. App. 826–27 (affirming trial court's finding of mutual assent to terms of settlement agreement when court stated that parties' intent clearly was "evidenced in the parties' words, acts, and [emails] setting forth the terms"). Therefore, it was not improper for the trial court to rely on the email communications entered into evidence at the hearing as evidence of the parties' words and conduct in determining

that a meeting of the minds had occurred, especially when the emails memorialized the terms that the attorneys had discussed at the pretrial conference and expressly indicated the plaintiff's acceptance of the settlement offer.

Moreover, the plaintiff's characterization of the emails as evidence of only "preliminary" communications or negotiations is not supported by the record.[14] No evidence was presented at the hearing establishing that the parties were in the process of ongoing negotiations concerning the terms of the settlement; rather, Attorney Angelone conveyed to Attorney Greene that the plaintiff had accepted the settlement offer, his testimony and the emails show the specific terms to which the parties had agreed, and, after informing Attorney Greene of the plaintiff's agreement to the settlement, Attorney Angelone informed the caseflow coordinator that the matter could be marked as settled but not withdrawn. Subsequent emails from Attorney Greene sought clarification as to when the plaintiff would be signing the agreement. This further dialogue between counsel does not undermine a finding that the parties had reached a mutual understanding as to the terms of the settlement as memorialized in their July 10 emails. See *Worth* v. *Picard*, supra, 233 Conn. App. 49–50 ("[T]he fact that parties engage in further negotiations to clarify the essential terms of their mutual undertakings does not establish the time at which their undertakings ripen into an enforceable agreement . . . [and we are aware of no authority] that assigns so draconian a consequence to a continuing dialogue between parties that have agreed to work together. We know of no authority that precludes contracting parties from engaging in subsequent negotiations to clarify or to modify the agreement that they had earlier reached. . . . More important . . . [when] the general terms on which the parties indisputably had agreed . . . included all the terms that were essential to

[14]Specifically, in her appellate brief, the plaintiff asserts that the court overlooked key evidence of ongoing negotiations, which consisted of the plaintiff's proposed new terms, "which were not conveyed to opposing counsel and never included in any draft," and the multiple emails from Attorney Greene seeking execution of the agreement.

an enforceable agreement . . . [u]nder the modern law of contract . . . the parties . . . may reach a binding agreement even if some of the terms of that agreement are still indefinite." (Internal quotation marks omitted.)).

Finally, to the extent that the plaintiff, in asserting this claim, rehashes the arguments she raised with respect to her first claim, we reject them for the same reasons as set forth in part I of this opinion and do not discuss them further.

III

Next, the plaintiff claims that Attorney Angelone did not have actual authority to bind her to the settlement agreement. According to the plaintiff, Connecticut law requires actual, not apparent authority, for an attorney to bind a client to a settlement agreement, and the defendants presented no evidence that Attorney Angelone had the plaintiff's "express permission to enter into a *final* agreement." (Emphasis in original.) We are not persuaded.

Initially, we note that, in asserting this claim, the plaintiff primarily relies on her declaration as demonstrating that she never consented or agreed to the settlement agreement. She contends that her statements in the declaration "were not contradicted by any other sworn testimony." For the reasons already set forth in this opinion, we conclude that these assertions are inaccurate, as the plaintiff's unsworn statements in the declaration do not constitute "sworn testimony," and the court properly did not afford any evidentiary value to the declaration and the statements contained therein.

Next, the plaintiff acknowledges that the court made no finding with respect to whether Attorney Angelone was authorized to settle the action on behalf of the plaintiff and claims that the court apparently "presumed authority," which was improper. Again, we do not agree.

In her objection to the defendants' motion to enforce the settlement agreement, the plaintiff asserted that

Attorney Angelone did not have authority to enter into the settlement agreement on her behalf. The court, however, never made any explicit findings in its oral decision with respect to Attorney Angelone's authority to settle the action,[15] and the plaintiff did not file a motion for articulation of the court's decision with respect to its failure to address this issue. " 'Where an appellant has failed to avail [her]self of the full panoply of articulation and review procedures, and absent some indication to the contrary, we ordinarily read a record to support, rather than to contradict, a trial court's judgment.' *Bell Food Services, Inc.* v. *Sherbacow*, 217 Conn. 476, 482, 586 A.2d 1157 (1991). Citing *Bell Food Services, Inc.*, this court recently reaffirmed that 'our appellate courts often have recited, in a variety of contexts, that, in the face of an ambiguous or incomplete record, we will presume, *in the absence of an articulation*, [that] a trial court acted correctly, meaning that it undertook a proper analysis of the law and made whatever findings of fact were necessary.' . . . *Zaniewski* v. *Zaniewski*, 190 Conn. App. 386, 396, 210 A.3d 620 (2019); see also *Sunset Gold Realty, LLC* v. *Premier Building & Development, Inc.*, 133 Conn. App. 445, 456 n.7, 36 A.3d 243 ('[b]ecause neither of the parties requested an articulation to fortify the record, to the extent that it is unclear what the court relied on . . . we read an ambiguous trial record to support, rather than undermine, the judgment'), cert. denied, 304 Conn. 912, 40 A.3d 319 (2012)." (Emphasis in original.) *White* v. *Latimer Point Condominium Assn., Inc.*, 191 Conn. App. 767, 778–79, 216 A.3d 830 (2019). Accordingly,

---

[15] We note that "[t]he relationship between attorneys and their clients" is one of agency; *Ackerman* v. *Sobol Family Partnership, LLP*, 298 Conn. 495, 509, 4 A.3d 288 (2010); and that "[t]he nature and extent of an agent's authority is a question of fact for the trier . . . ." (Internal quotation marks omitted.) *Hadji* v. *Snow*, 232 Conn. App. 829, 839, 339 A.3d 1168, cert. denied, 353 Conn. 902, 341 A.3d 958 (2025). Moreover, "[t]his court cannot find facts or draw conclusions from primary facts found, but can only review such findings to determine whether they could legally, logically and reasonably be found, thereby establishing that the trial court could reasonably conclude as it did." (Internal quotation marks omitted.) *J. B.* v. *C. B.*, 238 Conn. App. 664, 682, 357 A.3d 713 (2026).

in the present case, we presume, in the absence of any indication in the record suggesting otherwise, that the court properly applied the law.

Moreover, to the extent that the plaintiff claims that the court erred in making an implicit finding that Attorney Angelone had authority to enter into a settlement agreement on the plaintiff's behalf, the claim is belied by the testimonial and documentary evidence in the record indicating the plaintiff's assent to Attorney Angelone settling the case on her behalf. In addition to the statement in the July 10, 2024 email sent by Attorney Angelone that the plaintiff "accepts" the settlement offer, Attorney Angelone testified that he had authority from the plaintiff to make that communication, stating multiple times that the plaintiff had "authorized" him to do so. The plaintiff's claim, therefore, is unavailing.[16]

IV

The plaintiff's final claim is that the court failed to resolve material factual disputes concerning her consent, attorney authority and the finalization of essential terms before enforcing the settlement agreement and, thus, misapplied *Audubon* by enforcing the agreement despite the existence of those disputed facts and ambiguity in the terms of the agreement pertaining to confidentiality,

---

[16]In light of our conclusion that the record supported an implicit finding that Attorney Angelone had actual authority to settle the case on the plaintiff's behalf, we need not address the plaintiff's contention that actual, and not apparent, authority is required for an attorney to bind a client to a settlement agreement but note, nonetheless, that the plaintiff is mistaken in this assertion. See *Ackerman* v. *Sobol Family Partnership, LLP*, 298 Conn. 495, 510, 4 A.3d 288 (2010) ("[a]lthough reviewing courts in Connecticut have acknowledged that '[a]n attorney who is authorized to represent a client in litigation does not automatically have either implied or apparent authority to settle or otherwise to compromise the client's cause of action' . . . they also have repeatedly held that an agent with *implied or apparent authority* may bind the principal to an enforceable settlement agreement" (citation omitted; footnote omitted; emphasis altered)); see id. ("an attorney with apparent authority may enter into a settlement agreement that is binding on the client"), citing 1 Restatement (Third), Agency § 3.03, comment (b), p. 176 (2006).

nondisparagement, and restrictions on the plaintiff's future participation on the board of the condominium association. We disagree.

Initially, we note that, in asserting this claim, the plaintiff, again, rehashes many of the arguments raised with respect to her other claims, which we already have rejected. In particular, she contends that her declaration "went unrebutted" and that material factual disputes existed concerning whether she had consented, whether Attorney Angelone had actual authority to bind her to the settlement, whether material nonmonetary terms were finalized, and whether the parties had agreed to the same version of the agreement. In light of our conclusions in parts I through III of this opinion in which we already rejected these claims, we do not discuss them further. Moreover, in raising these claims, the plaintiff argues that the court improperly ignored testimony from Attorney Angelone to the effect that he had not approved or finalized the nonmonetary terms of the settlement, which we find unavailing. See *Hornish* v. *Suffield*, 234 Conn. App. 85, 98 n.7, 343 A.3d 516 (" '[i]t is well established that it is the exclusive province of the trier of fact to make determinations of credibility, crediting some, all, or none of a given witness' testimony' "), cert. denied, 353 Conn. 920, 345 A.3d 809 (2025); see also footnote 12 of this opinion.

To the extent that the plaintiff claims that the material terms were disputed because she had proposed new terms after the July 10 email, it bears repeating that, "[t]he test of disputation . . . must be applied to the parties at the time they entered into the alleged settlement. To hold otherwise would prevent any motion to enforce a settlement from ever being granted." (Internal quotation marks omitted.) *Worth* v. *Picard*, supra, 233 Conn. App. 50. In the present case, the court found that the parties had entered into an enforceable settlement agreement on or about July 9, 2024, at the pretrial conference, as evidenced by the July 10, 2024 emails between counsel and Attorney Angelone's conduct that same day in asking

the caseflow coordinator to mark the matter as settled but not withdrawn. Thus, the plaintiff's reliance on proposed new terms after the July 10 emails as evidence of a dispute as to the terms of the settlement lacks merit.[17]

The plaintiff also acknowledges in her appellate brief that those terms were never communicated to the defendants. "In the formation of contracts . . . it was long ago settled that secret, subjective intent is immaterial, so

[17]We note that the plaintiff also contends that the court improperly failed to make certain "necessary" factual findings or to address certain arguments, which allegedly resulted in "unresolved factual disputes." Specifically, the plaintiff contends that the court failed to make specific findings as to whether (1) the plaintiff consented to a settlement agreement, (2) the plaintiff proposed additional terms, (3) the parties were engaged in ongoing negotiations, (4) the plaintiff conditioned her acceptance of the defendants' offer on her review of the defendants' draft settlement agreement, (5) the plaintiff approved all nonmonetary provisions in the draft settlement agreement, and (6) material factual disputes existed regarding the formation, scope, and authority of counsel to bind the plaintiff to the settlement agreement. "It is well established that [i]t is the appellant's burden to provide an adequate record for review. . . . It is, therefore, the responsibility of the appellant to move for an articulation or rectification of the record where the trial court has failed to state the basis of a decision . . . to clarify the legal basis of a ruling . . . or to ask the trial judge to rule on an overlooked matter." (Internal quotation marks omitted.) *New Milford* v. *Standard Demolition Services, Inc.*, 212 Conn. App. 30, 70–71, 274 A.3d 911, cert. denied, 345 Conn. 908, 283 A.3d 506 (2022). Therefore, it was incumbent on the plaintiff to seek an articulation of the court's decision as to its failure to make any allegedly necessary findings. In light of the plaintiff's failure to do so, "we will, in the absence of a motion for articulation, assume that the trial court acted properly." (Internal quotation marks omitted.) *Nedder* v. *Nedder*, 226 Conn. App. 817, 821 n.2, 320 A.3d 180 (2024).

The plaintiff also asserts that the court failed "to explain why it credited [Attorney] Angelone's initial email but not his live testimony that the agreement was conditional and incomplete." We similarly reject the plaintiff's challenge to the court's assessment of the credibility of the evidence presented because it is well settled that "[t]he trial court is free to accept or reject, in whole or in part, the evidence presented by any witness, having the opportunity to observe the witnesses and gauge their credibility. . . . This court defers to the trial court's discretion in matters of determining credibility and the weight to be given to a witness' testimony." (Internal quotation marks omitted.) *Paquette* v. *Thompson*, 238 Conn. App. 395, 407, 356 A.3d 401, cert. denied, 354 Conn. 952, 357 A.3d 253 (2026).

that mutual assent is to be judged only by overt acts and words rather than by the hidden, subjective or secret intention of the parties." (Internal quotation marks omitted.) *Kinity* v. *US Bancorp*, supra, 212 Conn. App. 825–26; see also *Wittman* v. *Intense Movers, Inc.*, supra, 202 Conn. App. 103 (trial court properly refused to infer from communications between parties unexpressed intent on part of defendant that obtaining financing was contingency to any settlement, as "[o]ur law is quite clear—unexpressed intent is not relevant"); id. ("The mutual assent requirement of a settlement agreement cannot be defeated by the unexpressed subjective intent of one of the parties . . . . Consequently, what mattered to the court was what the parties wrote in their settlement agreement, not what they may have intended but never expressed." (Internal quotation marks omitted.)). Therefore, the plaintiff's alleged "additional terms" are not dispositive and are insufficient to render clearly erroneous the court's findings, which were supported by other evidence, including the parties' overt acts and words.

This court has rejected the plaintiff's claim that the terms of the settlement were disputed and incomplete. It follows that the plaintiff's contention that the court misapplied *Audubon* by enforcing the settlement when disputed terms existed, as well as her claim that summary enforcement of the settlement agreement was procedurally improper under the circumstances, necessarily fail.

The judgment is affirmed.

In this opinion the other judges concurred.